John Benjamin WALLACE,
Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–5964.

Court of Appeals of Alaska.

Feb. 28, 1997.

Rehearing Denied April 1, 1997.

Phillip Paul Weidner and Nicole D. Stucki, Weidner & Associates, Inc., Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

COATS, Judge.

On June 16, 1993, Detective Ronald Robinson of the Anchorage Police Department (APD) received an anonymous telephone call informing him that there was a marijuana growing operation located at 14201 Specking Road, "possibly in the upstairs and basement areas." The caller told Robinson "you can smell the marijuana outside of the building and you can hear fans running inside the building." Robinson said the caller had a "female voice" and spoke in a lucid manner. Robinson did not know the basis of the caller's information.

Robinson then telephoned a Chugach Electric Association (CEA) employee and requested information concerning the electric usage at 14201 Specking Road. Robinson did not obtain a search warrant or a subpoena for this information. Robinson was informed that the dwelling at this address was a duplex and that John Benjamin Wallace, Jr. was being billed for power consumption at both apartments. Robinson was told that the average monthly consumption was 3092 kilowatt-hours (kwh) for one apartment and 2557 kwh for the other. Robinson stated he knew from prior investigations that the average CEA customer uses 700 kwh of power per month.

On June 17, 1993, Robinson drove to 14201 Specking Road, accompanied by APD Detective Patrick O'Brien. O'Brien stayed in the car while Robinson walked up the driveway of the residence. Robinson said that as he

approached the residence he smelled the "fresh pungent odor of growing marijuana." He also heard fans running inside the residence. Robinson then passed through a gate, went up to the porch and rang the door bell. A man came to the door whom Robinson recognized from a driver's license photo as John Benjamin Wallace, Jr. Robinson asked Wallace if a fictitious person lived there and Wallace said he did not. Robinson asked if the residence was a duplex and Wallace responded it was not. Robinson stated in his affidavit for a search warrant that the smell of marijuana was stronger at the open door than in the driveway. When Robinson returned to the police car, O'Brien said he could smell marijuana on Robinson's clothing.

On June 18, 1993, Robinson submitted an affidavit and applied for a search warrant based on the information above. The magistrate issued a search warrant for the residence located at 14201 Specking Road.

On the evening of June 18, 1993, Robinson, accompanied by four other APD officers and two members of the Alaska National Guard, went to the Specking residence to serve the warrant. No one was home and the officers forced entry through the back door. A marijuana growing operation was discovered in the basement. The members of the National Guard assisted in the search of the basement and in dismantling the growing operation. Robinson found photographs of what appeared to be a different marijuana grow set up in a similar manner to the Specking Road grow just discovered. Paperwork was found upstairs, including a lease of a warehouse at 6100 Cordova Street to "John Walsh ... doing business as John Walsh & Associates," a power bill for the location, and a hand diagram of the warehouse indicating a "Lab 'A'" and a "Lab 'B.'"

Robinson and four other APD officers then went to the warehouse at 6100 Cordova Street. While standing in the dirt road leading to the parking lot of the warehouse, all five officers said they could smell the "fresh pungent odor of growing marijuana" and could hear what sounded like powerful fans inside the building. Based upon this information, on June 19, 1993, Robinson obtained a search warrant for the warehouse. Robinson, accompanied by four other APD officers and nine members of the National Guard, went to 6100 Cordova Street to serve the second search warrant. The police forced entry after there was no response to their knocking. The police found John B. Wallace, Jr. and Don Beaujean harvesting marijuana from a marijuana growing operation. Members of the National Guard stood around the perimeter of the warehouse when the police entered. The Guardsmen entered the warehouse after it was secured, dismantled the growing operation, and transported the marijuana and equipment to storage.

On September 15, 1993, an information was filed charging Wallace with six counts of fourth-degree misconduct involving a controlled substance. Wallace filed several pretrial motions, including a motion to suppress the evidence seized at his residence and at the warehouse. On January 6, 1995, Judge Mark C. Rowland denied these motions.

On January 9, 1995, Wallace entered nolo contendere pleas on two of the counts; the other four counts were dismissed. Wallace preserved the issues he has raised in this appeal under *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974).

On appeal, Wallace first contends that the Anchorage Police Department's use of the National Guard soldiers to execute the search warrants violated the Posse Comitatus Act and that the appropriate remedy is exclusion of the evidence discovered in the searches.

18 U.S.C. § 1385 (1988) (amended 1994), known as the Posse Comitatus Act, states:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The critical inquiry which must be answered is whether or not the Alaska National Guard constitutes "any part of the Army or the Air Force." 10 U.S.C. § 3062(c)(1) (1994) states:

> The Army consists of—

the Regular Army, the Army National Guard of the United States, the Army National Guard *while in the service of the United States,* and the Army Reserve[.]

(Emphasis added.) Likewise, 10 U.S.C. § 8062(d)(1) (1994) states:

The Air Force consists of—

the Regular Air Force, the Air National Guard of the United States, the Air National Guard *while in the service of the United States,* and the Air Force Reserve [.]

(Emphasis added.)[1] As stated above, when the Guardsmen participated in the search of Wallace's home and the Cordova Street warehouse, they were acting as members of the Alaska National Guard and were not in the service of the United States (also known as being "federalized"). Therefore, the Guardsmen were not "part of the Army or the Air Force." Under the plain language of the statute, the participation of the National Guard soldiers in serving the search warrant did not violate the Posse Comitatus Act.

Both the Third Circuit and a federal district court in Oregon have concluded that use of National Guard soldiers to enforce state criminal drug laws does not violate the Posse Comitatus Act. In *United States v. Benish,* 5 F.3d 20, 25–26 (3d Cir.1993), the Pennsylvania State Police used a squad from the Pennsylvania Army National Guard to assist them in the surveillance and investigation of a marijuana growing operation. The court concluded that the Posse Comitatus Act was not violated because the Guard unit was not in federal service. In *United States v. Kyllo,* 809 F.Supp. 787 (D.Or.1992), *overruled on other grounds,* 37 F.3d 526 (9th Cir.1994), a member of the Oregon National Guard operated a thermal imaging device in investigating a drug operation. The court ruled that

the Posse Comitatus Act was not violated, noting that: "[t]he Supreme Court has recognized the dual nature of a National Guard and the fact that National Guardsmen only lose their status as a member of a state National Guard when they are 'drafted into federal service by the President.'" *Id.* at 793 (citing *Perpich v. Department of Defense,* 496 U.S. 334, 344, 110 S.Ct. 2418, 2424, 110 L.Ed.2d 312 (1990)).[2]

Both the plain language of the Posse Comitatus Act and case law interpreting the Act support the conclusion that the state's use of National Guard soldiers to execute the search warrants did not violate the Posse Comitatus Act. We accordingly conclude that Judge Rowland did not err in finding that the state did not violate the Posse Comitatus Act in this case.

■ Wallace next contends that state statutes did not authorize the use of National Guard soldiers to execute the search warrants. However, the Alaska Constitution provides that "[t]he governor is commander-in-chief of the armed forces of the State. He may call out these forces to execute the laws, suppress or prevent insurrection or lawless violence, or repel invasion." Alaska Const., art. 3, § 19. Therefore, under the constitutional language, the governor is authorized to use National Guard soldiers to execute the laws. The statutes regulating the National Guard are set out in Chapter 5 of Title 26 of the Alaska Statutes. The parties have not cited any provision in that chapter that would prohibit the use of National Guard soldiers in this case.

Wallace argues that "[t]here is no federal law authorizing the National Guard's activities in the instant case." Wallace cites 10 U.S.C. § 375 (1994), which prohibits the "direct participation by a member of the Army,

---

**1.** Members of the Alaska National Guard can be members of either the Army National Guard or the Air National Guard.

**2.** Wallace focuses on the "military purpose" exception to the Posse Comitatus Act and argues that the use of the National Guard in the instant case does not fit within the exception. This argument is irrelevant. It is true that military personnel can search suspects and seize evidence, notwithstanding the language of the Posse

Comitatus Act, if an independent military purpose justifies the military involvement. *See Harker v. State,* 663 P.2d 932 (Alaska 1983). Wallace correctly asserts that no independent purpose justified the use of the National Guard to search Wallace's house and the warehouse. Nevertheless, no violation of the Posse Comitatus Act occurred because the Guardsmen were not federalized when they acted.

Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law." However, as we have previously discussed, the members of the Alaska National Guard who participated in the two searches were not members of the "Army, Navy, Air Force, or Marine Corps" because they were under the command of the Alaska National Guard and were not "in the service of the United States." Furthermore, 32 U.S.C. § 109 (1994) states that "[n]othing in this title limits the right of a State . . . to use its National Guard . . . within its borders in time of peace." Also, 32 U.S.C. § 112(d) (1994) states:

> Nothing in this section shall be construed as a limitation on the authority of any unit of the National Guard of a State, when such unit is not in Federal service, to perform law enforcement functions authorized to be performed by the National Guard by the laws of the State concerned.

Because federal law does not prohibit the use of the Alaska National Guard, and because the Guard was under the control of the State of Alaska's chain of command, the only restraint on the use of the Guard would be state law. As we have previously pointed out, state law does not appear to limit the governor's power to use the National Guard "to execute the laws."

■ Wallace next contends that the state did not show that the governor actually authorized the use of the National Guard soldiers to execute the search warrants in this case. He contends that Judge Rowland improperly limited his ability to argue this issue by examining documents *in camera* and not turning them over to the defense.

In *Braham v. State*, 571 P.2d 631, 643 (Alaska 1977), *cert. denied*, 436 U.S. 910, 98 S.Ct. 2246, 56 L.Ed.2d 410 (1978), the Supreme Court of Alaska stated the following concerning the duty of the prosecution to disclose confidential material to the defense:

> Non-disclosure was proper only if (1) the prosecution showed that discovery of the evidence would be inconsistent with protection of persons or enforcement of the laws and (2) the trial judge concluded that

the material was not relevant to the defense. If the district attorney failed to show that disclosure would harm enforcement or protection efforts, the materials must be disclosed. The question of relevance would then be decided in an adversary context; both counsel would have the opportunity to make their respective arguments.

> Disclosure is also required if the judge's in camera inspection showed that the material was relevant to the defense—whether or not the prosecutor had demonstrated that discovery would be inconsistent with enforcement or protection efforts. In the latter circumstance, the state must decide between continuing to prosecute, while incurring the problems posed by disclosure, and terminating the prosecution in order to maintain the material's secrecy.

(Footnotes omitted.)

In the instant case Wallace requested disclosure of the Alaska National Guard Counterdrug Plan. We have reviewed the materials which Judge Rowland reviewed *in camera*. We conclude that Judge Rowland did not err in refusing to require the prosecution to disclose to the defense the Alaska National Guard Counterdrug Plan. Judge Rowland could properly find that "discovery of the evidence would be inconsistent with protection of persons or enforcement of the laws" and "that the material was not relevant to the defense." The plan itself provides no insight into whether or not the governor of Alaska had authorized use of the National Guard for law enforcement purposes.

We believe that the record in this case sufficiently establishes that the use of National Guard soldiers to aid the police in executing the search warrant was properly authorized. A letter in the record from the statewide narcotics unit chief written on behalf of the attorney general, certified that the unit chief had reviewed the National Guard Counterdrug Plan for the fiscal year ending September 30, 1993, and concluded that "all operations and activities for the federal funding under the plan are consistent with and not prohibited by state law." We do not believe that the state was required to show

that the governor had specifically authorized the use of the National Guard in each individual case. We rely on *State v. Wheelon,* 137 Or.App. 63, 903 P.2d 399 (1995). In that case the court stated:

> Defendants also argue that the execution of the warrant was unconstitutional, because the Guard participated in it without direct, formal, written authorization from the Governor. The state argues that the use of the Guard was properly authorized. The trial court found that, although the Governor had not authorized the use of the Guard in this particular case, she had ordered the Guard to cooperate with the Yamhill County Interagency Narcotics Team. The trial court further found that, in this case, the Guard participated under the direct supervision of the state police. Defendant does not challenge those findings. The question, therefore, is whether the Governor's more general authorization suffices.

*Id.,* 903 P.2d at 405. Relying on the Oregon statutes, the court concluded that there was "no express requirement for the issuance of a formal, written order for each action the Guard is directed to take." *Id.* Similarly, as we have previously pointed out, the Alaska Constitution gives the governor broad authority to use the National Guard "to execute the laws." Alaska Const., art. 3, § 19. There is no requirement in the statutes regulating the National Guard (AS 26.05) which would require the governor to issue a formal written order for every individual action of the Guard.

Courts are entitled to rely on the presumption of regularity which attaches to the acts of public officials. The supreme court set out this presumption in *Wright v. State,* 501 P.2d 1360, 1372 (Alaska 1972), where the court quoted from *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960):

> Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties.

This court and the supreme court have adhered to this principle in subsequent cases. *See Tallman v. Dept. of Public Works,* 506 P.2d 679, 681 (Alaska 1973) (where the losing party in a civil trial challenged the array of the jury panel, the supreme court stated, "[u]nless a challenging party makes some showing of a miscarriage of the official duty, we shall presume that duty has been regularly performed") (footnote omitted); *Finkelstein v. Stout,* 774 P.2d 786, 790 (Alaska 1989) (presumption of regularity was rebutted concerning the casting of absentee ballots); *Jerrel v. State,* 851 P.2d 1365, 1372 (Alaska App.1993), *cert. denied,* 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994) ("The presumption of regularity attaches to this situation, requiring this court to presume, in the absence of a contrary showing, that the trial court acted in accordance with its ruling[.]"); *Houston–Hult v. State,* 843 P.2d 1262, 1266–67 (Alaska App.1992) (finding state established chain of evidence sufficiently, relying on presumption of regularity).

Employing the presumption of regularity, we conclude that Judge Rowland did not err in concluding that the use of the National Guard troops in this case was pursuant to lawful orders. We further conclude that Judge Rowland did not err in denying Wallace's motion to suppress on the ground that the use of these troops had not been properly authorized under state law.

■ Wallace next contends that there was insufficient evidence to support the issuance of the warrants to search Wallace's house and warehouse. However, the information which the police presented to the magistrate in support of the warrant to search Wallace's house is very similar to the information which we recently found was sufficient in *McClelland v. State,* 928 P.2d 1224 (Alaska App.1996). In *McClelland,* we followed "the vast majority of cases [which] support the conclusion that either the smell of growing marijuana or the odor of burning marijuana will support the issuance of a search warrant." *Id.* at 1226.

■ In the instant case, in his affidavit in support of the search warrant, Detective Robinson set out his extensive background in drug enforcement, including participation "in serving [thirty-two] search warrants involv-

ing indoor marijuana grow operations." He stated that "[b]ased on this experience I have come to be able to distinguish the fresh, pungent odor of growing or freshly harvested or processed marijuana." He then stated that he smelled the "fresh pungent odor of growing marijuana" as he approached Wallace's residence and the smell of marijuana was stronger at the open door of the residence. According to Detective Robinson, when he returned to the car after talking with Wallace, his partner, Detective Pat O'Brien, "who had not gotten out of the vehicle said he could smell marijuana on [Robinson's] clothing." From this testimony, the magistrate could properly determine that both officers were familiar with the odor of growing marijuana, could identify that odor, and smelled the odor coming from Wallace's residence. *See McClelland* at 1226. Additionally, in his affidavit Robinson also supported his conclusion that Wallace had a marijuana growing operation at his house with evidence of Wallace's high electrical usage and the information from the anonymous telephone call. Although the anonymous tip and Wallace's electrical consumption are insufficient by themselves to establish probable cause, this information does corroborate the most significant information supporting the search warrant—the fact that the officers smelled growing marijuana at Wallace's residence. We conclude that the information which Detective Robinson presented to the magistrate was sufficient for the magistrate to issue the search warrant. *See McClelland* at 1226–27.

Wallace next raises several arguments concerning the search of the warehouse. He first contends that the seizure of the documents and photographs at Wallace's house, which led the police to the warehouse, was not authorized by the warrant. Judge Rowland found that "the documents seized were within the ambit of the mandate contained in the warrant and related to legitimate purposes of the warrant in the Specking Street address." Judge Rowland's ruling is not clearly erroneous. The warrant authorized an extensive search for drugs and drug-related materials, and it appears that the photographs and documents which led the police to the warehouse were authorized by the warrant.

■ Wallace next contends that the search warrant for the warehouse was invalid because Robinson made misrepresentations in his affidavit in support of the search warrant. Robinson stated in his affidavit that paperwork found at Wallace's house "indicated" that Wallace leased and paid the electricity bills for the Cordova Street warehouse. In fact, Wallace elicited from Robinson that none of the paperwork regarding the Cordova Street warehouse actually had Wallace's name on it. Robinson apparently concluded that Wallace was associated with the warehouse because the paperwork was found in his house and because the warehouse paperwork was in the name of "J.B. Walsh" or "John Walsh," and Wallace's name is John B. Wallace, Jr. Robinson's affidavit could have led the magistrate to believe that Wallace's name was actually on the lease for the warehouse and its utility bills.

The Alaska Supreme Court in *State v. Malkin,* 722 P.2d 943 (Alaska 1986), held that misstatements in affidavits must be excised and the remainder of the affidavit tested for probable cause if (1) the defendant specifically points out the statements in the affidavit that are false, and (2) the state does not show by a preponderance of the evidence that the statements were not made intentionally or with reckless disregard for the truth. *Id.* at 946.

Robinson testified how he reached his conclusion that Wallace leased the warehouse and paid the utility bills. This testimony was sufficient for Judge Rowland to conclude that Robinson did not make intentional or reckless misstatements in order to obtain the search warrant. Also, Judge Rowland found that the search warrants were supported by sufficient evidence. Even if the information connecting Wallace with the warehouse was more specifically explained, the magistrate would have likely issued the warrant anyway. This is because the warrant was based almost entirely on the other information which the police found at the Specking Road house which led them to the warehouse, and upon the fact that the five officers smelled growing marijuana at the warehouse. Therefore,

Judge Rowland did not err in failing to suppress the second search warrant based upon the statements Detective Robinson presented to the magistrate.

■ Wallace contends that the state presented insufficient evidence to the magistrate to support the issuance of the second search warrant. However, as we indicated in our previous discussion, the materials which the police seized at Wallace's Specking Road house, coupled with their investigation of the warehouse (particularly the odor of marijuana emanating from the warehouse), supported the issuance of the search warrant.

■ Wallace next reasons that since the search warrants in question empowered "any peace officer" to serve the warrants, the search warrants did not authorize the police to allow the National Guard soldiers to assist them in serving the search warrant because the soldiers were not peace officers. When confronted with this argument, Judge Rowland pointed out that a police officer can call upon any citizen for assistance. Judge Rowland's observation is supported by AS 12.35.040, which provides that an officer executing a warrant has the power and authority "to call any other person to the officer's aid." We accordingly conclude that Judge Rowland did not err in rejecting this argument.

■ Wallace asserts that Detective Robinson violated his rights to privacy and freedom from unreasonable searches and seizures when he went through a gate in Wallace's fence, walked up the driveway to the front porch, and rang the doorbell. Wallace argues that this constituted a warrantless search of the curtilage surrounding his home, leading to the discovery of the odor of marijuana when Wallace opened his door. On this issue, Professor Wayne R. LaFave cites *Lorenzana v. Superior Court*, 9 Cal.3d 626, 108 Cal.Rptr. 585, 511 P.2d 33 (1973) for the principle that "[a] sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there." 1 Wayne R. LaFave, *Search and Seizure,*

§ 2.3(c) at 482–83 (3d ed.1996). LaFave continues by citing other cases:

> [C]ourts have held "that police with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public," and that in so doing they "are free to keep their eyes open and use their other senses." This means, therefore, that if police utilize "normal means of access to and egress from the house" for some legitimate purpose, such as to make inquiries of the occupant ... it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling.

*Id.* at 483–84 (footnotes omitted).

The Alaska Supreme Court has adopted this rationale. In *Pistro v. State*, 590 P.2d 884 (Alaska 1979), an Alaska State Trooper, with information that stolen truck parts may be in defendant Pistro's garage, drove into his driveway. As he walked up to the side door of the garage to talk to two men he saw inside, he observed through the garage window an engine hanging on a block and tackle. Pistro was ultimately convicted of larceny and concealing stolen property. On appeal, Pistro argued that the trooper, by moving up the driveway, was trespassing and searching without a warrant. The court stated:

> Police officers walking through an unfenced driveway to inquire at premises have been held not to invade any reasonable expectation of privacy. The driveway was a normal means of ingress and egress impliedly open to public use by one desiring to speak to occupants of the garage, or to park off the street while visiting occupants of the house. This is not a case of an officer leaving such a means of public access to spy from an area not impliedly open to the public. There was no invasion of rights to privacy, and [the trooper] could constitutionally observe what was in plain view in the garage.

*Pistro,* 590 P.2d at 887 (footnote omitted).

According to Judge Rowland's findings, Detective Robinson, like the trooper in *Pistro,* approached Wallace's residence via the driveway, a normal means of ingress and

egress. Accordingly, Judge Rowland did not err in rejecting Wallace's argument.

■■■ Wallace contends that Detective Robinson acted illegally and without a proper purpose, by approaching his residence and asking Wallace if a fictitious person lived there. However, courts have routinely allowed police to employ non-coercive trickery in the course of investigations, and in serving search warrants. *See State v. Weller,* 76 Wash.App. 165, 884 P.2d 610, 612 (1994) (detective knocked on defendant's door and pretended to be looking for table saw; court held the officer may lawfully enter porch and smell marijuana without violating the resident's right to privacy); *United States v. Leung,* 929 F.2d 1204, 1208 (7th Cir.), *cert. denied,* 502 U.S. 906, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991) (police investigating heroin sale properly used ruse which caused defendant to open door to hotel room); *Lockwood v. State,* 591 P.2d 969, 972 (Alaska 1979) (officers serving search warrant used ruse which caused defendant to open door; entry upheld because officers substantially complied with knock and announce requirements).

Detective Robinson was not required to be completely candid with Wallace by informing him that he was investigating whether Wallace was harboring a marijuana growing operation. Under the law, the police have leeway to conceal the purpose of their investigation to avoid alerting suspects to the fact that they are being investigated. Requiring Detective Robinson to be more candid with Wallace might very well have alerted Wallace to the fact that he was being investigated, and resulted in the destruction of evidence. There is simply no such legal requirement.

■■■ Wallace next cites *McGahan v. State,* 807 P.2d 506, 509–11 (Alaska App. 1991), in which this court held that reasonable suspicion was required before the government could conduct a search with a trained dog to detect drugs. Wallace contends that we should impose a similar requirement on police officers, and require a police officer to have reasonable suspicion before he can approach a residence to detect drugs using his sense of smell. In discussing this issue, Professor LaFave states:

> [T]here is no "reasonable expectation of privacy" from lawfully positioned agents "with inquisitive nostrils." This means, for example, that no search in a Fourth Amendment sense has occurred when a law enforcement officer, lawfully present at a certain place, detects odors emanating from private premises, from a vehicle, or from some personal effects nearby.

1 LaFave, *supra,* at 403 (footnotes omitted). We agree with Professor LaFave's analysis and conclude that Judge Rowland did not err in denying Wallace's motion to suppress on this ground.

■■■ Wallace asserts that his rights to privacy and freedom from unreasonable search and seizure were violated by the police when they obtained his electrical usage records without a warrant. Wallace acknowledged that at the time he submitted his brief, Alaska courts had not yet ruled on this issue. Subsequently, this court addressed this issue in *Samson v. State,* 919 P.2d 171 (Alaska App.1996). This court ruled that "utility records are maintained by the utility and do not constitute information in which society is prepared to recognize a reasonable expectation of privacy." *Id.* at 173. We adhere to our decision in *Samson,* and conclude that Wallace had no reasonable expectation of privacy in his utility records.

The conviction is AFFIRMED.