**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 21 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHIRLEY ELLEN HUTCHINGS AND
KENNETH ORVILLE HUTCHINGS,

Defendants - Appellants.

No. 96-4171, 96-4172

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. Nos. 93-CR-214-02 and 93-CR214-01)**

---

Jerold D. McPhee, Salt Lake City, Utah, appearing for Defendants-Appellants.

Bruce C. Lubeck, Assistant U.S. Attorney (Scott M. Matheson, Jr., U.S. Attorney, with him on the brief), Office of the U.S. Attorney, Salt Lake City, Utah, appearing for Plaintiff-Appellee.

---

Before TACHA, MCKAY, and MURPHY, Circuit Judges.

---

TACHA, Circuit Judge.

---

Defendants Kenneth and Shirley Hutchings each plead guilty to one charge

of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1), and were each

sentenced to forty months imprisonment and a five-year supervised release. They appeal from the district court's denial of their motion to suppress evidence. The defendants claim that law enforcement officers collected evidence against them in a manner prohibited by both the Posse Comitatus Act and the Fourth Amendment of the U.S. Constitution. We take jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## Background

Prior to and during the summer of 1993, the United States Bureau of Land Management ("BLM") employed defendants Kenneth and Shirley Hutchings to provide security and maintenance on an otherwise-abandoned, 10,000-square-acre property known as the White River Oil Shale Project ("White River"), located in Uintah County, Utah. The main compound of White River consisted of various facilities formerly maintained by private oil companies. The Hutchings lived there in a trailer, which they owned, and also kept a shed containing personal belongings there.

That same summer, a number of federal and state government agencies--including the BLM, the Drug Enforcement Administration ("DEA"), the Utah Division of Investigations, and the Utah National Guard--participated jointly in Operation Greenleaf, a marijuana eradication program. On August 10, 1993, two participants in Operation Greenleaf, Sergeant John Egbert of the Utah National

Guard and DEA Special Agent Jeff Bryan, hiked onto White River land, acting on reports of a marijuana "grow" in the area. Sgt. Egbert, who was under the command of Utah National Guard Lt. Col. Kim Watts, carried orienteering equipment and relayed reports from Bryan to DEA local headquarters with his advanced communications equipment. The next day, August 11, Sgt. Egbert, Agent Bryan, and another DEA agent observed the defendants watering marijuana plants some distance from the trailer.

That night, additional DEA personnel joined the three men outside the White River region. Shortly after midnight, DEA agents and other law enforcement personnel entered the compound, ordered the Hutchings out of their trailer, and arrested them. Several officers briefly entered the trailer; the entry lasted less than one minute and nothing was seized from the trailer at that time. Sgt. Egbert remained in a vehicle and did not participate in the arrest.

For several hours on August 12, Sergeant Egbert aided the others in removing the plants--performing what is known as a "whack and stack"--a process that was not completed until late in the afternoon. Seven other National Guardsmen, all under the command of Lt. Col. Watts, provided helicopter services, communications support, and other indirect assistance during the whack and stack.

A warrant authorizing a search of the compound, including the Hutchings' trailer, was obtained at approximately 6:00 p.m. on August 12. The warrant described the trailer's location, make, color and design, year of manufacture, and serial number. It misidentified the geographic location of the compound as section 14; in fact, it was situated in section 27. Immediately after receiving notification that the warrant had been issued, the officers searched the trailer for evidence.

## Discussion

We first address the application of the Posse Comitatus Act to these events and then proceed to the related Fourth Amendment issues.

## I. <u>The Posse Comitatus Act.</u>

The Posse Comitatus Act ("PCA") was enacted at the end of Reconstruction for the purpose of "limit[ing] 'the direct active use of federal troops by civil law enforcement officers' to enforce the laws of this nation." <u>U.S. v. Hartley</u>, 796 F.2d 112, 114 (5th Cir. 1986) (quoting <u>U.S. v. Red Feather</u>, 392 F. Supp. 916, 922 (D.S.D. 1975)). The PCA states that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more that $10,000 or imprisoned

not more than two years, or both." 18 U.S.C. § 1385.[1]  We assume, without deciding, that despite the rather peripheral involvement of the Utah National Guard in the above events, Sgt. Egbert, Lt. Col. Woods, and the other National Guardsmen "executed" law for purposes of the PCA.  See Hartley, 796 F.2d at 114-15 (discussing degree of military involvement necessary to trigger the PCA). Nonetheless, we hold that none of the actions taken by the Utah National Guardsmen at White River violated the PCA.

The dispositive question here is whether the officers were "any part of the Army or Air Force" during the activities at White River.  A brief explanation of the National Guard's complex structure is necessary to explain why they were not. The National Guard occupies a unique place in our federal system of government; it has been described appropriately as a "hybrid" body.  See Tirado-Acosta v. Puerto Rico National Guard, 118 F.3d 852, 853 (1st Cir. 1997).  All reservists who enlist in a state's National Guard simultaneously enlist in the National Guard of the United States.  See Perpich v. Dept. of Defense, 496 U.S. 334, 345 (1990). By enlisting with the United States, the Guardsmen become part of the Army's reserve force; they are not on active duty with the Army.  See id.; see also 10 U.S.C. § 101(d)(1) (noting, in definition of "active duty" in U.S. military, that

---

[1] Since these events occurred, Congress has amended the PCA to read: ". . . . shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C.A. § 1385 (Supp. 1997).

such duty "does not include full-time National Guard duty").  Guardsmen do not become part of the Army itself until such time as they may be ordered into active federal duty by an official acting under a grant of statutory authority from Congress. See, e.g., Perpich, 496 U.S. at 343-44 (discussing statutes that have authorized the President to draft the National Guard into federal service); 10 U.S.C. § 12,301 (formerly codified at 10 U.S.C. § 672) (authorizing the Secretary of the Army, Navy, or Air Force (or his designee) to call the National Guard into federal service in time of war or national emergency).  When that triggering event occurs, a Guardsman becomes a part of the Army and loses his status as a state serviceman.  See 32 U.S.C. § 325(a); Perpich, 496 U.S. at 348.  But until a Guardsman receives orders directing him into federal service, he is a state serviceman, and not part of the federal Army.

Therefore, a National Guardsman's participation in a marijuana arrest-- without more--does not  constitute a violation of the PCA.  See United States v. Benish, 5 F.3d 20, 25-26 (3d Cir. 1993); United States v. Kyllo, 809 F. Supp. 787, 792-93 (D. Or. 1992), vacated in part on other grounds by 37 F.3d 531 (9th Cir. 1994); Wallace v. State, 933 P.2d 1157, 1159-60 (Alaska Ct. App. 1997).  In such a case, it remains to be proven that the Guardsman had been ordered into federal service at the time.

It would, in fact, be a rare situation in which a Guardsman enforced drug laws and was *not* serving the state. Under federal funding laws which allow the National Guards to participate in programs such as Operation Greenleaf, the National Guards forfeit their federal support if any Guardsmen employed in an anti-drug effort are in federal service. See 32 U.S.C. § 112(a)(1) (granting funds for use of National Guardsman in anti-drug efforts "*while not in federal service*") (emphasis added). That condition was, in fact, likely added to ensure that the federal funding of counter-drug activities did not lead to abuse of the Posse Comitatus Act. Tirado-Acosta, 118 F.3d at 853.

It is possible, however, that a Guardsman who had been called into federal service--that is, one who was wearing his federal "hat"--could be wrongfully employed in a domestic anti-drug campaign. In the instant case, however, the district court found in accordance with the undisputed evidence that the Guardsmen were in state service for the entire duration of the drug interdiction efforts at White River on August 10-12, including the time of the Hutchings' arrest and the whack-and-stack operation. United States v. Hutchings, No. 93-CR-214G (D. Utah Dec. 11, 1995). Lt. Col. Watts specifically instructed the involved Guardsmen that they were under the direction of the Governor of Utah during this time. Id. More importantly, the orders themselves indicated a "Title 32 Duty Status," demonstrating that the Guardsmen's assignment to White River

was a state-controlled, not a federal, assignment. Id. We adhere to the district court's conclusions and find no violation of the PCA.

It is true, as the defendant notes, that a National Guardsman may *appear* to be a member of the Army because he is wearing a similar uniform or is carrying identification that is unclear as to whether he is under state or federal command. These indicia, however persuasive they may be to the eye, have never determined the character of a Guardsman's service. As discussed above, that question depends solely on whether command of the Guardsman has been taken away from a state's governor by one authorized to do so by Congress. Such action is absent in this case.

The defendant also argues that the activities at White River violated a federal requirement that counter-drug activities in which the National Guard participates be authorized by state law. See 32 U.S.C. § 112(c)(4). This attack fails for two reasons. First, Utah Code Annotated § 39-1-5 provides broad authority for the use of the Utah National Guard, stating that the "governor may order into active service the National Guard . . . as he finds necessary." Second, the statute upon which this argument is based, 32 U.S.C. § 112, is merely a funding statute. The only consequence of running afoul of section 112 is the revocation of monies. It does not impact this litigation in any way.

In light of the above, we need not reach the question of whether exclusion of evidence is an appropriate remedy when federal military personnel collect evidence in violation of the PCA.

## II.  The Fourth Amendment

We next address the Hutchings' claim that the initial "search" of the land, prior to obtaining the warrant, was unconstitutional.  It is well-established that government activity is not a search unless it intrudes upon an individual's justified expectation of privacy.  See, e.g., Katz v. United States, 389 U.S. 347, 352-53 (1967).  The search of White River, of course, occurred on government-owned property.  The Hutchings could not have had a justified expectation of privacy in such land.  Furthermore, the plants were growing in an open field; open fields receive Fourth Amendment protection only in rare circumstances not relevant here.  See, e.g. United States v. Dunn, 480 U.S. 294, 302-05 (1987); Hester v. United States, 265 U.S. 57 (1924).

The Hutchings also assert that the warrantless "protective sweep" of their trailer at the time of their arrest violated the Fourth Amendment and seek suppression of all physical evidence seized in the trailer.  However, the district court found that the officers were in the trailer for less than one minute and that the purpose of the entry was to conduct a quick sweep of the trailer to secure the trailer and ensure the safety of the officers.  The Fourth Amendment does not

require a warrant for brief protective sweeps like this one. See, e.g., United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994) (protective sweeps justified by possibility of danger to officers); United States v. Scroger, 98 F.3d 1256, 1259-60 (10th Cir. 1996) (officers' fear of imminent destruction of evidence may justify warrantless entry). Moreover, even if we were to find that this brief entry was unjustified, there is no evidence to be suppressed as a result. The district court found that the officers did not perform a search of the contents of the trailer or seize any items at that time. United States v. Hutchings, No. 93-CR-214G (D. Utah Dec. 11, 1995). Furthermore, the defendants have not alleged that the officers relied on observations made during the initial entry in order to obtain the warrant.

The Hutchings additionally contend that the incorrect legal description contained in the search warrant of the section number where the trailer was located violated the Fourth Amendment. Even making the assumption that a warrant was in fact required for the search of the Hutchings' trailer, this argument is without merit. Our general rule is that a "'description is sufficient [if it] enable[s] the officers to ascertain the place to be searched' with reasonable effort." United States v. Sturmoski, 971 F.2d 452, 458 (10th Cir. 1992) (alterations in original) (quoting United States v. DePugh, 452 F.2d 915, 920 (10th Cir. 1971)). Here, the warrant identified the Nomad trailer by brand, color,

and serial number. To call this rather particular warrant insufficient would be to ignore the admonition that "practical accuracy rather than technical precision controls the determination of whether a search warrant adequately describes the place to be searched." United States v. Occhipinti, 998 F.2d 791, 799 (10th Cir. 1993) (quoting United States v. Durrough, 927 F.2d 498, 500 (10th Cir. 1991)). Furthermore, this court takes into account the executing officers' knowledge of the place to be searched in determining the adequacy of a warrant's descriptions. Id. The affidavit accompanying the warrant request stated that the officers had observed the Nomad the previous evening.

Finally, the Hutchings argue that the warrant was invalid because it failed to state that a residence was to be searched, citing our decision in U.S. v. Dahlman, 13 F.3d 1391 (10th Cir. 1993). The warrant in Dahlman simply identified certain subdivision plots and authorized a search of the "premises" without mentioning that there were any buildings, much less a residence, on the property. Id. at 1395. In contrast, the warrant here did not merely authorize a vague search of the "premises"; it distinctly stated that buildings and vehicles on the premises were to be searched. As noted above, the warrant included a detailed description of the trailer that was the Hutchings' residence, identifying it as an "R.V." Thus, Dahlman is inapposite here.

## Conclusion

We find that the activities of the National Guardsmen did not violate the PCA, and that the search of the Hutchings' marijuana plants and trailer did not violate the Fourth Amendment. We affirm the district court's denial of the Hutchings' motion to suppress evidence.