5 P.2d 903

**STATE of Arizona, Appellant,**

v.

**Corey Matthew ADAMS, Appellee.**

**No. 1 CA–CR 98–0528.**

Court of Appeals of Arizona,
Division 1, Department E.

May 9, 2000.

As Amended May 12, 2000.

Richard M. Romley, Maricopa County Attorney by Gerald R. Grant, Deputy County Attorney, Criminal Division, Phoenix, Attorneys for Appellant.

Debus, Kazan & Westerhausen, Ltd. by Lawrence I. Kazan, Esq., Tracey Westerhausen, Esq., Phoenix, Attorneys for Appellee.

## OPINION

GERBER, Judge.

¶ 1 Does a criminal defendant whose business premises are subjected to a lawful search pursuant to a warrant, have a reasonable expectation of privacy in a personal residence unlawfully maintained on the same property? Because we conclude that this defendant did enjoy an expectation of personal privacy beyond the commercial enterprise, we affirm the trial court's order suppressing the evidence seized from the residence.

## FACTS AND PROCEDURAL HISTORY

### THE FIRST SEARCH

¶ 2 On June 26, 1997, undercover officers with the Mesa Police Department attended a performance by the band Eroticide at the Nile Theater in downtown Mesa owned by defendant Corey Adams. The police had previously received information that the band used graphic sexual props and engaged in actual or simulated sexual acts during performances. While attending the performance, the police suspected that some members of the audience were juveniles between the ages of fifteen and eighteen.

¶ 3 The police concluded that they had probable cause to charge the band members and the management of the theater with furnishing obscene or harmful items to minors, presentation of obscene items, and admitting minors to a public display of sexual conduct in violation of Arizona Revised Statutes Annotated ("A.R.S.") sections 13–3506(A) (1989), 13–3502(A)(4), and 13–3556(A).

¶ 4 In anticipation of a second Eroticide concert at the theater on August 1, 1997, the police obtained a warrant permitting them to search "the premises known as The Nile Theater[,]105 W. Main Street" for evidence supporting the contemplated charges. The search warrant described the theater as "a two story structure with an additional level

under grade," and noted the absence of "numbers affixed to the structure to identify its street address."

¶ 5 Approximately 30 Mesa police officers attended Eroticide's second performance at the theater, after which they executed the search warrant. In the course of doing so, officers discovered a theater employee unlocking an exterior door not described in the affidavit nor accessible from the theater. The officers obtained the key from the employee by consent and unlocked the door, which led to a stairwell rising to the second floor. The officers, ascending this stairwell, found two more doors at the top of the stairs. Entering one of those doors, they discovered Adams' private apartment, which they then searched.

¶ 6 The warrant specified that the police could search only the premises known as "The Nile Theater." Neither the warrant nor the supporting affidavit contained any reference to Adams' private residence. Nevertheless, upon discovering his apartment, the officers proceeded to search it in detail. In the living room, they found a computer, fax machine, scanner and copier on a desk and, nearby, business records relating to the theater.

### THE SECOND AND THIRD SEARCHES

¶ 7 One of the officers participating in the search of Adams' apartment, a burglary detective, noticed a distinctive, wooden wall unit, as well as several pieces of electronic equipment that had been reported stolen from a local builder. Relying on this detective's discovery of this stolen property, the police obtained a second warrant for the theater which expressly permitted them to search the second-floor residence for stolen furniture and electronic equipment.

¶ 8 In the course of executing this second warrant, the police discovered additional stolen items in Adams' apartment including a refrigerator, an oven, a microwave, a Jacuzzi tub, a toilet and a chandelier. Based on these discoveries, the police then obtained a third search warrant permitting them to return and seize these additional items.

### THE MOTION TO SUPPRESS

¶ 9 After a grand jury indicted Adams on five counts of theft for the stolen property recovered during the second and third searches, he filed a motion to suppress all the seized evidence.[1] He maintained that the first search warrant did not authorize the search of his private residence and that there was no probable cause to do so. In his view, the police obtained probable cause to support the subsequent search warrants solely through their discoveries during the initial illegal search. He accordingly argued that evidence seized pursuant to the second and third warrants should be suppressed as fruits of the poisonous tree.

¶ 10 The trial court conducted an extensive evidentiary hearing on Adams' motion, which revealed that, prior to obtaining the first warrant, the police knew or had reason to know that Adams was residing at the theater building. Police records indicated that his address was "105 W. Main," the same address as the theater. His driver's license similarly identified his address as "105 W. Main." In addition, an earlier Mesa police report on an unrelated matter two months before the issuance of the search warrant, stated "Corey lives at 105 West Main." City of Mesa utility bills for the theater identified it as at "105 W. Main," and also showed his own address as "105 W. Main, Suite 201."

¶ 11 Although this evidence indicated that Adams maintained his private residence on the second-floor of the theater, inspectors in the city's building department testified that the theater was not zoned for residential use. In 1996 Adams had petitioned the city to convert the zoning for the second floor from business occupancy to a combination of business and residential occupancy. He then submitted architectural plans to support the petition but later withdrew his request after the city informed him that building codes for residential use would require him to install, among other things, a sprinkler system and fire separation walls. His subsequent resi-

---

1. For his involvement in the Eroticide performances, the state charged Adams for various obscenity-related crimes in a separate indictment, which is not part of this appeal.

dential occupancy of the second-floor of the commercially-zoned theater thus violated the city's zoning ordinance.

### THE TRIAL COURT'S RULING

¶ 12 In granting Adams' motion to suppress, the trial court stated that the "focus" of its analysis was whether, prior to obtaining the initial warrant, the police "knew or should have known that the Defendant's apartment was on the second floor of the building located at 105 West Main in Mesa." Citing the United States Supreme Court's decision in *Maryland v. Garrison*, 480 U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), the court noted that, "if the officers had known, or even if they should have known," that Adams' private residence was located on the second floor of the theater, "they would have been obligated to exclude [the] apartment from the scope of the requested warrant."

¶ 13 Given the considerable information available to the police that Adams resided on the second floor of the theater, the trial court concluded that the officers either knew or had reason to know the existence of the apartment. The court noted that Adams "did not set up a makeshift cot and an electrical heating element to boil water for temporary overnight stays at his business. This is a case where the Defendant was living at a fully decorated and remodeled apartment on the second floor of the building[.]"

¶ 14 Equating Adams' dual use of his building with cases involving legitimate, multiple occupancy of a single structure, *see, e.g., Garrison*, 480 U.S. at 80, 107 S.Ct. 1013, *and State v. Burns*, 163 Ariz. 44, 45, 785 P.2d 1232, 1233 (1989), the trial court also observed that a warrant for a multiple occupancy structure is generally invalid if it fails to describe the specific subunit to be searched. Concluding that the initial warrant was invalid for failure to particularly describe the place to be searched, the court held that the police violated Adams' Fourth Amendment rights in their first unauthorized search of his apartment. The court did not discuss the fact that his private apartment violated Mesa's zoning ordinance.

¶ 15 The state timely appealed the trial court's ruling. We have jurisdiction under the Arizona Constitution, article 6, section 9, and A.R.S. sections 12–120.21(A)(1) (1992), 13–4031 (1989) and 13–4032(6) (Supp.1998).

### DISCUSSION

¶ 16 In reviewing the trial court's ruling, we give deference to the trial judge's factual findings. *See State v. Blackmore*, 186 Ariz. 630, 632, 925 P.2d 1347, 1349 (1996). We review de novo, however, the legal question whether the search of his second-floor apartment violated Adams' constitutional rights. *See id.; State v. Fodor*, 179 Ariz. 442, 448, 880 P.2d 662, 668 (1994).

¶ 17 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable search and seizures." A protected Fourth Amendment interest requires an individual's "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 141, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A court must answer two questions to determine the existence of a legitimate expectation of privacy. "The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'" in the place that was the subject of the search. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). "The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable'.'" *Id.*

¶ 18 Answers to these questions are clouded by the double nature of Adams' relationship to the property because he maintains both his residence and his theater business at the same location. He does not argue that the police lacked probable cause to search his business or that the execution of the search warrant otherwise violated his legitimate expectation of privacy regarding his business premises.

¶ 19 Adams does argue an expectation of privacy in his residence. Its second, residential floor was accessible only by a sepa-

rate, locked exterior entrance for which only Adams and one of his employees had a key. Only Adams possessed the key to the other door leading to his private apartment. His apartment was fully furnished and functional, with bathroom and fully stocked kitchen.[2] These factors indicate that Adams "exhibited an actual (subjective) expectation of privacy" in his apartment which exceeded the degree of privacy expected in the theater portion of the building. *Smith*, 442 U.S. at 740, 99 S.Ct. 2577.

¶ 20 The more difficult question is whether his subjective expectation of privacy in the apartment is "one that society is prepared to recognize as reasonable." *Id.* We are required to look at the totality of the circumstances in determining an objective expectation of privacy. *State v. Steiger*, 134 Ariz. 268, 272, 655 P.2d 808, 812 (1982). The state presented undisputed evidence that Adams' residential apartment violated Mesa's zoning ordinance and that he was aware of the violation but nevertheless proceeded to construct and reside there in a fully decorated apartment. We must determine if such a knowing violation deprives him of his Fourth Amendment right to privacy.

¶ 21 We have been unable to find a case from this jurisdiction or any other with similar facts. Other courts have held that a defendant lacks a reasonable expectation of privacy in a dwelling unlawfully located on property belonging to the government or a third party. *See, e.g., Amezquita v. Hernandez–Colon*, 518 F.2d 8 (1st Cir.1975)(squatters had no legitimate expectation of privacy in structures built on property belonging to the Commonwealth of Puerto Rico); *United States v. Ruckman*, 806 F.2d 1471 (10th Cir. 1986) (no legitimate expectation of privacy in cave occupied on federal land); *State v. Cleator*, 71 Wash.App. 217, 857 P.2d 306 (1993) (no legitimate expectation of privacy in tent unlawfully erected on public property); *and*

*State v. Mooney*, 218 Conn. 85, 588 A.2d 145 (1991) (no legitimate expectation of privacy in bridge abutment). Those cases can be distinguished because those defendants were not entitled to occupy the properties at all; as trespassers, they could not have any reasonable expectation of privacy in another's property. *See Woodson v. Commonwealth of Virginia*, 25 Va.App. 621, 491 S.E.2d 743, 746 (1997).

¶ 22 Here, the situation differs. Adams legally owned his building and enjoyed the right to be there notwithstanding his zoning violation. Moreover, he had the right to exclude anyone he wished from his property.[3] One of the main rights attached to property is the right to exclude others. "[O]ne who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *See Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. 421 (citations omitted).

¶ 23 Even a known violation of a zoning ordinance should not deprive Adams of his expectation of privacy in his residence. Otherwise, a court would have to find that individuals who build non-complying guest houses in their backyards or convert garages into residential apartments would thereby lose any reasonable expectation of privacy in those structures simply by an administrative violation. Managers or owners of apartment buildings in known violation of zoning or building codes would also lose their right to privacy, perhaps in the entire building. An expectation of privacy in one's own residence would disappear with any known regulatory violation. We conclude that Adams had both a subjective and objective expectation of privacy in his second floor residence that is not defeated by his zoning violation.

¶ 24 The next question becomes whether the search was valid. The trial court held that the initial search was invalid

---

2. The fact that the apartment was allegedly furnished with stolen furniture and appliances does not deprive Adams of his subjective expectation of privacy. *See U.S. v. Gooch*, 6 F.3d 673, 677 (9th Cir.1993).

3. If an individual were to enter or remain unlawfully in Adams' apartment, it is likely that person

properly could be charged with criminal trespass in the first degree because it is a residential structure, adapted for both human residence and lodging. *See* A.R.S §§ 13–1501(7) and 13–1504 (1989). The same would be true of burglary. Zoning of the property as "nonresidential" would be irrelevant.

## 574

because the warrant failed to particularly describe the place to be searched. *See Garrison,* 480 U.S. at 80, 107 S.Ct. 1013; *Burns,* 163 Ariz. at 45, 785 P.2d at 1233. It further found that, prior to obtaining the initial warrant, the police knew or should have known that Adams lived at the theater building. The trial court also noted that the affidavit supporting the first warrant did not provide probable cause to search his residence. It concluded that the police drafted the warrant so as to exclude the apartment from the scope of the search. *See Garrison,* 480 U.S. at 85, 107 S.Ct. 1013. Given the amount of evidence—Adams' driver's license, the utility bills, the mention of his address in earlier police records and reports—the trial court did not abuse its discretion in finding that the police disregarded the fact that Adams maintained his residence at the theater and that this disregard was unreasonable in light of their records showing his residence at that address.

¶ 25 The Fourth Amendment requires that a search warrant particularly describe the place to be searched and the things to be seized. *See Garrison,* 480 U.S. at 84, 107 S.Ct. 1013. This limitation safeguards the individual's privacy interest against "the wide-ranging exploratory searches the Framers [of the Constitution] intended to prohibit." *Id.; Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (particularity requirement "prevents the seizure of one thing under a warrant describing another") (citation omitted). This warrant does not mention the existence of Adams' separate residence in spite of the several police records indicating his home address. Police department records show that the officers knew that Adams lived at the theater but, despite this knowledge, failed to include *any* description of his residence in the warrant. Such a lack of diligence fails the Fourth Amendment particularity requirement. Moreover, none of the exceptions to the particularity requirement exists here. If several people occupy the premises in common and they share a common area, a warrant describing the entire premises is valid. *See Burns,* 163 Ariz. at 46–47, 785 P.2d at 1234–35. Only Adams and a trusted employee had access to the separate second-floor apartment, which was inaccessible to theater patrons or to outsiders because of the two locked doors and separate exterior entrance.

¶ 26 The dissent claims that another exception supports the warrant's probable cause. When a person owns and controls the entire building, "a finding of probable cause as to a portion of the premises is sufficient to support a search of the entire structure." *U.S. v. Butler,* 71 F.3d 243, 249 (7th Cir.1995). However, the *Butler* building was residential and the warrant so indicated.[4] In *United States v. Gilman,* 684 F.2d 616 (9th Cir. 1982), another case cited by the dissent, the warrant only described the building by its address and officers searched its entirety, including office and residential areas. However, the *Gilman* court only addressed the admission of evidence seized from the office and not the residence. Here, the evidence at issue was seized from the residence and was unrelated to the evidence seized from the rest of the theater.

¶ 27 This warrant described the property as "the Nile Theater" and, later listed "Corey M. Adams ... dba (doing business as) the Nile Theater." It clearly covered only the business portion of the theater, and not Adams' private residence. Extending such a "commercial" warrant to a private residence violates the Fourth Amendment's particularity requirement and the special role of the home in Fourth Amendment jurisprudence. *See U.S. v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[t]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"); *U.S. v. Dahlman,* 13 F.3d 1391, 1396 (10th Cir.1993) (warrant should indicate that the place to be searched as a residence). We accordingly affirm the suppression order.

E.G. NOYES, Jr., Judge, concurring.

4. The dissent also cites *U.S. v. Gonzalez,* 697 F.2d 155 (6th Cir.1983) where officers searched the entire structure, an apartment on the second floor and an empty room on the first-floor.

However, the *Gonzalez* warrant, unlike this one, described both the apartment and the empty first floor room, which used to be a business.

TOCI, Judge, dissenting.

¶ 28 The majority miscasts the issue—the issue is not whether the defendant has a reasonable expectation of privacy in his residence on the second floor of the Nile Theater. The issue is whether the magistrate's finding of probable cause to search the entire building permitted the search of defendant's second floor residence. Relying on *Garrison,* the majority concludes that the warrant to search the Nile Theater building was defective because it did not describe the defendant's unlawful residence on the second floor of the building.[5] But an exception to *Garrison* exists where, as in this case, the entire building is owned and controlled by the target of the warrant. *See United States v. Butler,* 71 F.3d 243, 249 (7th Cir.1995). Therefore, I respectfully dissent.

¶ 29 It is not necessary for a warrant to describe subunits in a multiple occupancy structure when probable cause exists to search the entire structure. *See id.* Probable cause to search an entire multiple occupancy structure exists when the occupants have access to the entire structure. *See Burns,* 163 Ariz. at 47, 785 P.2d at 1235. *See also United States v. Whitney,* 633 F.2d 902, 907 n. 3 (9th Cir.1980) (exceptions to the rule that warrants must describe subunits exist when premises are occupied in common, defendant controls entire premises, or the entire premises are suspect).[6] Probable cause to search an entire structure also exists when "the target of the investigation or warrant exercise[s] 'dominion and control' over the entire building or ha[s] access to the entire structure." *Butler,* 71 F.3d at 249; *see also United States v. Gonzalez,* 697 F.2d 155, 156 (6th Cir.1983) (probable cause found for warrant authorizing search of entire structure with business on lower floor and residence on upper floor because entire structure was under "singular control" of defendants); *United States v. Gilman,* 684 F.2d 616, 618 (9th

Cir.1982) (warrant valid for office and residence on premises since defendant was in control of the whole building).

¶ 30 For example, in *Gilman,* much as in the case before us, the warrant described a building located at 924 Grove Street, which housed the defendant's business offices. *Id.* at 618. The warrant did not mention that the building contained residential apartments. *Id.* On appeal, the court held that the general rule for voiding the warrant for an undisclosed multiunit structure does not apply "if the defendant was in control of the whole premises, or if the entire premises were suspect, or if the multiunit character of the premises was not known to the officers." *Id.*

¶ 31 Here, the trial court was concerned with *Garrison's* requirement that known residential subunits in a multiple occupancy structure be specifically identified in the warrant. Following *Garrison,* the trial court concluded that the police did not have probable cause to search what they should have known was defendant's residence in the Nile Theater. But unlike *Garrison,* rather than simply occupying a rented residential unit on the second floor of the Nile Theater building, the defendant here owns and controls the entire building. Under the singular occupancy exception to *Garrison,* probable cause existed to search the entire structure known as the Nile Theater.

¶ 32 Furthermore, defendant's ownership and control, coupled with the layout of the building, made the entire premises a place in which evidence supporting the charges might be found. The police had a reasonable belief that documentary evidence sought by warrant would be found in an office that could be located anywhere in the building, including on the second floor. On that basis alone, probable cause existed to search the entire

5. The building was identified in the warrant as the "Nile Theater" because it did not have any visible street address, and because it was commonly identified in that fashion. The scope of the warrant was not limited to the stage, auditorium, and box office, i.e., the 'theater' portion of the structure, but instead, described and referred to the entire "two story structure." Thus, the second story of the Nile Theater, located at 105

W. Main Street, was clearly within the scope of the warrant.

6. *Whitney* incorrectly cites 380 S.W.2d 561, 22 A.L.R.3d 1330; the annotation, *Search Warrant: Sufficiency of Description of Apartment or Room to Be Searched in Multiple–Occupancy Structure,* is at 11 A.L.R.3d 1330.

structure. *See Burns*, 163 Ariz. at 46, 785 P.2d at 1234 ("[w]here the entire premises, rather than a particular subunit, are under suspicion of illegal activity, a warrant for the entire residence may be valid").

¶ 33 Citing *United States v. United States Dist. Court*, 407 U.S. 297, 299, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), a case involving warrantless surveillance, the majority attempts to create a distinction between warrants for commercial structures and those for residential structures. The majority correctly asserts that under the Fourth Amendment homes are entitled to heightened protection. But this principle is only applicable to cases involving *warrantless* entry; it has no application to this case, where entry was made pursuant to warrant. *See, e.g., State v. Ault*, 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986) ("Unlawful entry of homes was the chief evil which the Fourth Amendment was designed to prevent .... [a]s a matter of Arizona law, officers may not make a *warrantless* entry into a home in the absence of exigent circumstances or other necessity.") (citations omitted, emphasis added).

¶ 34 Furthermore, the Fourth Amendment particularity requirement does not require that a warrant explicitly characterize whether the place to be searched is a residence. *See, e.g., Ault*, 150 Ariz. at 466–67, 724 P.2d at 552–53; *United States v. Hutchings*, 127 F.3d 1255, 1260 (10th Cir.1997) (warrant including detailed description of trailer to be searched was not invalid for failure to state that trailer was used as a residence); *United States v. Williams*, 687 F.2d 290, 293 (9th Cir.1982) (cabin occupied by defendant was within scope of warrant that referred only to "premises" and did not describe building on premises as a residence).

¶ 35 The majority cites *Dahlman* for the proposition that a warrant should indicate that the place to be searched is a residence. The *Dahlman* court, however, was concerned with a vague description of the place to be searched. The warrant authorized the search of "Tee Pee Ranch Phase II, Type II Subdivision, Carton County, New Mexico, Lots 128 and 129" but failed to describe any structures on those lots. 13 F.3d at 1394. The court held that "a residence may not be

searched when the property description is ambiguous." *Id.* at 1396. In *Hutchings*, the court clarified its holding in *Dahlman:*

> Finally, the Hutchings argue that the warrant was invalid because it failed to state that a residence was to be searched, citing our decision in *U.S. v. Dahlman*. The warrant in *Dahlman* simply identified certain subdivision lots and authorized a search of the "premises" without mentioning that there were any buildings, much less a residence, on the property. In contrast, the warrant here did not merely authorize a vague search of the "premises"; it distinctly stated that buildings and vehicles on the premises were to searched.... Thus, *Dahlman* is inapposite here.

127 F.3d at 1260 (citations omitted). Thus *Dahlman* merely held that a vague description of the place to be searched could have been cured by stating that the place included a residence. To the extent that *Dahlman* requires that a warrant contain the magic word "residence" or be invalid, it is clearly overruled by *Hutchings*.

¶ 36 A description is not vague if it limits the scope of the search to those areas in which probable cause exists to believe that items connected with criminal activity will be found. *See Garrison*, 480 U.S. at 84, 107 S.Ct. 1013. The description in the warrant for the Nile Theater was not vague. *Dahlman* is as inapposite here as it was in *Hutchings*.

¶ 37 The majority cites no cases to support the conclusion that a residence within a commercial structure enjoys a heightened standard of probable cause for issuance of a search warrant. The standard for finding probable cause is the same whether or not a portion of the premises is commercial or residential. *See United States v. Garnett*, 951 F.Supp. 657, 661–62 (E.D.Mich.1996) (that defendant was running an underground nightclub and selling drugs from location in which he rented entire building supported probable cause to search "basement storage and work area, and a second story living quarters area").

¶ 38 Defendant concedes that probable cause existed to search the business premises known as the Nile Theater. If so, no legal principle required that the search warrant describe defendant's residence on the second floor. Because defendant controlled the whole premises, and because the whole premises were suspect, the search was lawful. Therefore, the trial court erred in failing to defer to the issuing magistrate's finding of probable cause. I would reverse the trial court's order suppressing the evidence.