■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANGELO

QUATTRACHI and VINCENT BILELLA, Respondents.—Appeal by the People from an order of the Supreme Court, Richmond County, entered June 23, 1977, which granted defendants' motion to suppress certain physical evidence. Order affirmed, indictment dismissed, and case remitted to the Criminal Term for the purpose of entering an order in its discretion pursuant to CPL 160.50. The entry of the agents of the Federal Bureau of Investigation onto the private residential property where the defendants were loading cartons into a van constituted an unreasonable search in violation of the Fourth Amendment (see *People v Gleeson,* 36 NY2d 462; *People v Abruzzi,* 52 AD2d 499, affd 42 NY2d 813). At the time the agents entered, they had only a vague suspicion, based upon an anonymous telephone call, that defendants were loading liquor into a van. They testified that at the time they entered the fenced-in yard they were unable to read the labels on the cartons. Furthermore, they were unaware that any crime had been committed, although the liquor was later traced to a truck hijacking. The District Attorney maintains that the intrusion was minimal and authorized by the common-law power of the police to inquire into and investigate events and prevent crimes (see, e.g., *People v Rosemond,* 26 NY2d 101, 103-105). The argument continues that the entry was made solely to determine what the defendants were doing and whether they had a right to be there. However, it is clear that part of the reason for entering was to make a determination of what property was being loaded. Such behavior amounted to an unconstitutional search since it was not based upon probable cause to believe a crime was being committed. "The common-law authority of the police to make investigative inquiries * * * does not give the police a license to violate the Constitution" *(People v Cantor,* 36 NY2d 106, 113). Although a minimal encroachment on personal freedom may be justified where the investigation involves a serious crime, or is based upon a high degree of suspicion (see *People v Kuhn,* 33 NY2d 203; *People v Morales,* 22 NY2d 55), such is not the case here. Further, the agents had other practical alternatives to immediate entry (cf. *People v Wharton,* 60 AD2d 291), they could have walked to the gate and engaged defendants in conversation or continued their surveillance of the van until their suspicions were further substantiated. Consequently, the evidence seized as a result of the illegal entry was properly suppressed (see *McDonald v United States,* 335 US 451). Additionally, the prosecutor's reliance on *People v Farenga* (42 NY2d 1092) is misplaced. Although the factual situation is somewhat similar, in that a warrantless search of a van and a garage on private premises was upheld, the case is distinguishable. Unlike the case at bar, the investigators in the *Farenga* case were tentatively able to identify cartons of untaxed cigarettes from their vantage point in the street based upon the suspicious brown wrapping paper on the cartons. Furthermore, the license plate of a car parked in front of the premises was traced to a prior seizure of untaxed cigatettes before the search took place. Finally, the reasonable expectation of privacy was not as great in the *Farenga* situation since the driveway used by defendants was a common driveway shared by the adjoining building. Irrespective of whether the enclosed area in this case constituted a "curtilage" (see *United States v Potts,* 297 F2d 68, 69), it is clear that defendants, as tenants or licensees, had a legitimate expectation of privacy while on the premises which could not be violated on the basis of mere suspicion. The garage was recessed from the street and the yard was completely fenced. The street visibility of the activities on the driveway was minimal, as evidenced by the need for entry before the agents were able to identify the nature and contents of the items being loaded on the van (cf.

*United States v Magana,* 512 F2d 1169, 1171, cert den 423 US 826). Damiani, J. P., Titone and Cohalan, JJ., concur; Shapiro, J., dissents and votes to reverse the order appealed from and to deny the motion to suppress, with the following memorandum:

### THE FACTS

On November 5, 1976 an anonymous call was received by the Manhattan office of the Federal Bureau of Investigation. The message was that "two men were loading liquor * * * from a truck * * * into a garage, and this garage has been used previously for storing cigarettes". The location indicated was a residential neighborhood and the premises were a private two-story dwelling with a detached garage. The property was fenced, but the fence was open. Two FBI agents went to that address pursuant to the telephone call, arriving at about 2:00 P.M. The agents initially saw no activity but, on their return from making a telephone call to confirm the address, they observed two individuals loading boxes onto "a small van, something like an Econoliner Ford". They "saw them [indicating the defendants] picking boxes up from the garage and putting them on to the van". The agents went around the block to another vantage point, from which they continued to see activity. One agent described the boxes as "cardboard * * * maybe cube-shaped, eighteen inches cube-shaped" of different colors, with writing on them. The writing could not be distinguished from the street. The observation from the front and back streets of the premises lasted 10 or more minutes. The two agents then drove into the yard, got out of their car and approached the two men. No consent was asked or given for the agents initially to enter the yard where the garage was located, nor was a warrant applied for. One of the agents testified that their purpose in going onto the property was to see whether the individuals had a reason to be on the property and whether the liquor was theirs. The agents identified themselves to defendants and told them that a call concerning some liquor had been received and asked whether they had any receipts for the boxes now identified as liquor (Smirnoff's Vodka and J & B Scotch). Both defendants said they did not have receipts. The defendants were informed that the agents intended to "call our office, see if we could determine where this shipment came from." There were 250 cartons of liquor in all—15 in the van and the remainder stacked in the garage. Simultaneously with the initial inquiry, one of the agents found a stack of invoices, which were shown to defendants, who said that they did not know what they were or that they had been there. The invoices were found by the agent "on the driveway, parking pad [sic] next to the rear doors that were opened." The invoices had the delivery names "razor-bladed off", except that one still had the name "Pippens" remaining on it. The agent took that invoice and recorded information from some of the cartons and relayed the information to the FBI hijacking supervisor in New York. The defendants were told that inquiry was being made "whether it was a regular or stolen shipment." The response from New York was that a truck belonging to the only firm which supplied liquor to Pippens had been hijacked the previous day. The liquor was, in fact, the shipment hijacked from that truck. The defendants were told that the New York City Police Safe and Loft Squad was on its way since the hijacking was an intra-State event over which the *Federal* agents had no jurisdiction. Both defendants were given *Miranda* warnings as soon as they were unable to supply invoices for the liquor. During the period between the receipt of information that the liquor was a stolen shipment and the arrival of the New York City Police, the defendants were neither advised they were under arrest nor handcuffed. At the defendants' request,

because of the cold, the two agents and the two defendants waited in the agents' car. One of the defendants testified that he had gotten permission to use the garage from his brother's mother-in-law. No rent had been paid or specifically agreed upon. The hearing Judge, in suppressing the liquor and invoices, made findings of fact and conclusions of law, the essential elements of which were: (1) The agents had no right to enter the property for the area was within a curtilage and the agents were therefore trespassers. (2) The credibility of the FBI agents was accepted and the conduct of the defendants was held to be suspicious only because of the anonymous tip. (3) Anything that happened after the entry tainted the seizure of both the liquor and the invoices.

### THE ISSUES

### I. WAS THERE HERE AN UNREASONABLE SEARCH AND SEIZURE BY THE FBI AGENTS?

The Fourth Amendment of the United States Constitution guarantees the right of the People to be secure in their houses, persons, papers and effects against unreasonable searches and seizure. That right extends to automobiles *(Preston v United States,* 376 US 364, 366), to hotel rooms *(Stoner v California,* 376 US 483) and, unquestionably, to houses *(United States v Jeffers,* 342 US 48, 51). But the question here is whether the "curtilage" principle is protected by that amendment as to the driveway of a private dwelling under the circumstances here present.[1] The "curtilage" of a dwelling has been defined as "such space as is necessary and convenient, and is habitually used, for family purposes, and the carrying on of domestic employments, including a yard, a garden, or even a nearby field used in connection with the dwelling" (5 Am Jur 2d, Arson, § 1). The question of whether a driveway is part of the "curtilage" of a dwelling was addressed, but not answered, in *United States v Bustamante-Gamez* (488 F2d 4, 7-8, cert den 416 US 970). The court there stated: "It is by no means certain that the entry upon the driveway was contrary to the Fourth Amendment, even though there were no warrant or exceptional circumstances excusing failure to obtain one. The driveway may not have been such a place as to support a *reasonable expectation of privacy"* (emphasis supplied). Although there the question of reasonable expectation of privacy was deferred, it was answered in *United States v Magana* (512 F2d 1169, cert den 423 US 826). In that case, the court found that a driveway was only a semiprivate area; the expectation of privacy depended on the activities carried on and the degree of visibility from the street. It held that it would be unwise to classify all driveways, *as a matter of law,* as protected by the Fourth Amendment. The test suggested was one of reasonableness, examining both the possessors' expectation of privacy and the officers' reasons for being on the driveway. In *Magana* the officers were providing security for a fellow officer who was involved in a narcotics arrest. They noticed the defendant discarding some goods in the backyard. The court, under the circumstances, found that there had been no reasonable expectation of privacy with respect to the driveway (see *United States v Capps,* 435 F2d 637; *Wattenburg v United States,* 388

---

1. The concept of "curtilage" apparently arose in connection with an effort to include outbuildings as part of the home which could be the subject matter of a common-law burglary (see 4 Blackstone's Commentaries, p 225).

F2d 853).[2] In *People v Farenga* (42 NY2d 1092, 1093), although stating that "a private driveway leading to a home is not outside the area entitled to protection against unreasonable search and seizure", the court nevertheless upheld a search and seizure accomplished without a warrant, stating: "the record in this case reveals that the driveway here was one in which the defendants' activities were carried on in such an overt manner that the suppression court had a right to find that the investigator, in positioning himself there, had not invaded an area as to which defendants had a logical expectation of privacy (see *People v Doerbecker, supra* [39 NY2d], p 452; *United States v Magana, supra,* p 1171; *Wattenburg v United States,* 388 F2d 853, 857; cf. *Mancusi v De Forte,* 392 US 364; *People v Abruzzi,* 42 NY2d 813, affg on opn at 52 AD2d 499). Also, the truck and other vehicles then available to the defendants for speedy and wholesale removal of the large stock of cigarettes presented exigent circumstances which made search and seizure of the contents of the garage in which they were located permissible without a warrant (cf. *People v Vaccaro,* 39 NY2d 468, 472-473; *People v Clements,* 37 NY2d 675, 679, cert den 425 US 911)." The reasoning of *Farenga* would seem to indicate that the action of the Federal agents here was entirely proper. There, in sustaining the denial of the suppression motion, the court did not do so upon any finding of probable cause or reasonable suspicion, but on the theory of "exigent circumstances" and that the activities of the defendants were conducted in an area which was in open view and therefore had been conducted without any expectation of privacy. That is precisely the situation here, for the defendants were engaged in loading the truck with cartons to the free eyes of any passersby. Under such circumstances it can hardly be argued that their privacy was invaded when, by their own conduct, they explicitly disclaimed that right. In a similar vein, the Supreme Court of California, in *People v Bradley* (1 Cal 3d 80), held that the defendant had not been deprived of any reasonable expectation of privacy when he grew marihuana in his backyard, which was in open view and freely accessible to delivery men and others. Thus, the court there admitted into evidence the marihuana seized by police during a search based upon less than probable cause. Here the defendants, by their open and overt conduct, exhibited no desire to keep their activities private and the authorities, confronted as they were with "exigent circumstances" (see *People v Farenga, supra),* were justified in entering upon the driveway and making the inquiries and observations that they did. In sum, taking into consideration all of the factors here present (1) the anonymous tip, (2) Federal agents' observations of the defendants loading what appeared to be cases of liquor from a residential garage into a van, (3) the unusual activity

---

2. In the *Wattenburg* case, the court laid down what I believe to be the proper approach to the "curtilage" rule as it is affected by the Fourth Amendment. The court there said (p 858): "The 'curtilage' test is predicated upon a common law concept which has no historical relevancy to the Fourth Amendment guaranty. In *Jones v. United States,* 362 U. S. 257, 266 * * * the Supreme Court warned, in connection with another search and seizure problem, that: '[I]t is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law * * *.' If the determination of such questions is made to turn upon the degree of privacy a resident is seeking to preserve as shown by the facts of the particular case, rather than upon a resort to the ancient concept of curtilage, attention will be more effectively focused on the basic interest which the Fourth Amendment was designed to protect".

and unusual number of cases involved and (4) the exigency involving the possibility of quick escape, the agents were justified in entering the driveway and making inquiry.

## II. INEVITABLE DISCOVERY

Assuming, *arguendo,* however, that there was here a trespass based upon a finding that a driveway, under all circumstances, would be included within the ambit of the Fourth Amendment and that defendants' open and overt activities failed to remove the driveway from what would ordinarily be a protected area by a lack of expectation of privacy, the order of suppression should nevertheless be reversed under the inevitable discovery exception to the exclusionary rule. In *People v Fitzpatrick* (32 NY2d 499, 506, cert den 414 US 1033), the court held that "evidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence." This is such a case, for if the agents had called their hijacking supervisor *before* entering on the driveway, instead of after, they would have learned that a shipment of liquor had been hijacked the day before. That information, while not constituting probable cause, certainly would have constituted reasonable suspicion permitting an inquiry. The doctrine of inevitable discovery, carved out as an exception to the fruit-of-the-poisonous-tree doctrine to permit the receipt of otherwise inadmissible evidence which in the natural course of events would have been discovered by the use of legal means, is based upon the sound rationale that only evidence that "would not have been found, if officials had not violated the laws designed to deny them access to it" will be suppressed *(United States v Coplon,* 185 F2d 629, 640, cert den 342 US 920). That situation obtains here.

### CONCLUSION

The judicially created exclusionary rule should not, of course, be so interpreted so as to emasculate a defendant's constitutional rights to be secure against unreasonable search and seizure, but neither should it be so stretched as to do violence to common sense. That, in my opinion, is what results here by the suppression order which is being sustained. It should be reversed and the motion to suppress should be denied.

