IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

NOV 16 2010

COURT OF APPEALS
DIVISION TWO

THE STATE OF ARIZONA,               )
                                    )       2 CA-CR 2009-0176
                    Appellee,       )       DEPARTMENT B
                                    )
        v.                          )       O P I N I O N
                                    )
BRIAN MANNIE BLAKLEY,               )
                                    )
                    Appellant.      )
_____ )


APPEAL FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR200800814

Honorable Wallace R. Hoggatt, Judge

VACATED AND REMANDED

---

Terry Goddard, Arizona Attorney General
  By Kent E. Cattani and Laura P. Chiasson                          Tucson
                                                        Attorneys for Appellee


Gail Gianasi Natale                                                Phoenix
                                                        Attorney for Appellant

_____


V Á S Q U E Z, Presiding Judge.

**¶1** After a jury trial, appellant Brian Blakley was convicted of one count of possession of marijuana for sale, and the trial court sentenced him to a presumptive, enhanced prison term of 15.75 years, ordering him to pay the maximum fine of $150,000. On appeal, he contends the court abused its discretion in 1) denying his motion to suppress evidence obtained by police after a warrantless entry onto his property; 2) admitting documents in violation of his Confrontation Clause rights; 3) refusing to instruct the jury on the lesser-included offense of simple possession; and 4) failing to consider mitigating factors at sentencing and imposing a fine he contends is excessive. For the reasons stated below, we vacate and remand for proceedings consistent with this opinion.

### Factual and Procedural History

**¶2** On appeal, we view the facts in the light most favorable to sustaining the verdict. *See State v. Haight-Gyuro*, 218 Ariz. 356, ¶ 2, 186 P.3d 33, 34 (App. 2008). On November 4, 2008, Bisbee police officer William Silva received a telephone call from the United States Border Patrol about a suspicious vehicle that was being driven in an area that was a known pick-up point for traffickers of undocumented immigrants and marijuana. Silva went to the location and saw a black Dodge Neon leaving the area. Silva followed the vehicle until it eventually turned into the driveway of Blakley's residence.[1] He called for back-up, waited five to ten minutes, and then approached the vehicle with two other officers.

---

[1]At the suppression hearing, Silva testified he was not given a description of the suspicious vehicle, its license plate number, nor told why it was deemed suspicious.

2

¶3 When Silva reached the rear of the vehicle, Blakley approached him from behind the residence. Silva asked him "if he was storing undocumented aliens or marijuana," and Blakley responded that he was storing marijuana. When Silva asked how much, Blakley told him there were more than 100 pounds. Silva then asked if he could search the garage, and Blakley consented. At the suppression hearing, Silva testified that during their conversation, while standing behind the vehicle, he could smell the odor of marijuana. In the garage, Silva found eight bales of marijuana weighing a total of 170 pounds. Blakley was arrested and subsequently charged with and convicted of one count of possession of marijuana for sale. This timely appeal followed.

## Discussion

### I. Suppression of Evidence

#### A. Warrantless Entry

¶4 Blakley first contends "[t]he trial court erred as a matter of law by refusing to suppress the evidence obtained as a result of the illegal warrantless search" of the garage. He maintains that, although he consented to the search, his consent was tainted by Silva's illegal entry into Blakley's yard without a warrant in violation of the United

---

Thus, there was no information from which he could have determined that the vehicle he had followed was the same suspicious vehicle referred to in the phone call. Nor did Silva witness the driver of the vehicle commit any traffic violations during the drive to Blakley's residence. However, he did observe the driver making numerous u-turns, stopping for no reason, going in "no set direction," and "in [his] experience . . . try[ing] to lose any type of surveillance or . . . trailing vehicles."

3

States and Arizona Constitutions.[2] He therefore contends "any evidence obtained as a result of Silva's conversation with [him] following the policeman's illegal, warrantless entry was fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963).

¶5 When reviewing a trial court's denial of a motion to suppress, we consider only the evidence presented at the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631, 925 P.2d 1347, 1348 (1996), and view it in the light most favorable to upholding the court's ruling, *State v. Gerlaugh*, 134 Ariz. 164, 167, 654 P.2d 800, 803 (1982). "We review the . . . court's ruling . . . for abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Booker*, 212 Ariz. 502, ¶ 10, 135 P.3d 57, 59 (App. 2006).

¶6 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable search and seizures." U.S. Const. amend. IV. "Unlawful entry of homes was the chief evil which the Fourth Amendment was designed to prevent." *State v. Ault*, 150 Ariz. 459, 463, 724 P.2d 545, 549 (1986). "That protection extends in general to '["]the curtilage," the land immediately surrounding and associated with the home.'" *State v. Olm*, 223 Ariz. 429, ¶ 5, 224 P.3d 245, 247 (App. 2010), *quoting Oliver v. United States*, 466 U.S. 170, 180 (1986). Thus, as a general rule, a warrant is required when the suspect has a reasonable

---

[2]Blakley argues the officer's search of the garage without a warrant violated his rights under the Arizona Constitution. Ariz. Const. art. 2, § 8. However, he "makes no separate argument based on the state constitutional provision; therefore, we do not separately discuss it." *State v. Nunez*, 167 Ariz. 272, n.2, 806 P.2d 861, 863 n.2 (1991).

expectation of privacy in the place or the item searched. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In determining whether a suspect's objective expectation of privacy is reasonable, a court considers the totality of the circumstances. *State v. Adams*, 197 Ariz. 569, ¶ 20, 5 P.3d 903, 907 (App. 2000). And, "'[s]ubject only to a few specifically established and well-delineated exceptions,' a search is presumed to be unreasonable under the Fourth Amendment if it is not . . . conducted pursuant to a valid search warrant." *State v. Gant*, 216 Ariz. 1, ¶ 8, 162 P.3d 640, 642 (2007), *quoting Katz v. United States*, 389 U.S. 347, 357 (1967).

¶7 The state does not dispute that the vehicle was parked in the curtilage of Blakley's house. And, as noted above, curtilage generally falls "under the home's [']umbrella' of Fourth Amendment protection." *Olm*, 223 Ariz. 429, ¶ 12, 224 P.3d at 249, *quoting United States v. Dunn*, 480 U.S. 294, 301 (1987). However, this does not end our inquiry. The vehicle was parked in the driveway, an area generally considered "semiprivate." *See State v. Cobb*, 115 Ariz. 484, 489, 566 P.2d 285, 290 (1977). Thus, we must determine initially whether Blakley had a reasonable expectation of privacy in the area of the driveway where the vehicle was located. If he did, the same Fourth Amendment protection applicable to curtilage applies to that area, and we then must determine whether the state met its burden of establishing that the search following Silva's entry into that area was constitutionally sound. *Olm*, 223 Ariz. 429, ¶ 5, 224 P.3d at 247.

¶8 Relying on *Olm*, Blakley claims that Silva made a "fatal mistake" when he approached the vehicle instead of the front door of the residence. He contends that by

continuing down the driveway, Silva had crossed into "warrant-with-search-territory." Although Blakley asserts that *Olm* is dispositive in this case, we find it factually distinguishable and, thus, not controlling.

**¶9** In *Olm*, a Tucson police officer, acting on a request from a detective, entered Olm's property without a warrant and looked through the windshield of his vehicle to obtain the vehicle identification number (VIN). 223 Ariz. 49, ¶¶ 2-3, 224 P.3d at 247. The vehicle "was parked in the residence's yard, to the left of a concrete walkway leading to the front door of the house from a public sidewalk adjacent to a public street," and it was facing the residence with its front end about five to six feet from the house. *Id.* ¶ 2. In order to inspect the vehicle, the officer first had to step off the walkway leading to the front door. *Id.* The officer looked through the windshield and noticed that the vehicle's VIN plate was slightly bent. *Id.* ¶ 3. He then went to the front door of the house, where he unsuccessfully tried to contact the residents. *Id.*

**¶10** On appeal, following Olm's conviction for theft by control of a vehicle and conducting a "chop shop," *id.* ¶ 4, this court concluded that the vehicle had been parked on the residence's curtilage and that the officer was not lawfully present when he looked through the windshield and saw the VIN plate. *Id.* ¶ 17. In determining that Olm had a protected privacy interest in the yard where the vehicle had been parked, we focused on the fact that the officer had to leave the walkway and physically enter the yard in order to look inside the vehicle to see the VIN plate. We concluded that "no reasonable member of the public would believe he or she had permission to enter the yard to peer into the vehicle," and, therefore, the officer had violated Olm's reasonable

6

expectation of privacy in his front yard. *Olm*, 223 Ariz. 429, ¶ 15, 224 P.3d at 250. Here, as in *Olm*, before investigating the vehicle, Silva made no attempt to contact the occupants of the residence using the pathway that led directly from the driveway along the front of the residence to the front door. But he also never left Blakley's driveway, which, unlike the yard in *Olm*, is a "semiprivate area." *See id.* ¶ 15.

¶11 Relying on the semiprivate nature of the driveway, the state argued below that Silva was entitled to "waltz right down it" because he could "see the whole length of the driveway and see what [he was] after." However, in *Olm*, we recognized that "driveways are considered semiprivate areas not because members of the public reasonably could enter them without explicit permission, but because the activities and items in a driveway generally are more readily observable." *Id.*

¶12 Neither of the cases the state relies upon supports its position that an officer has unfettered access to the entire driveway merely because its entire length is readily observable.[3] In *United States. v. Cisneros-Gutierrez*, 598 F.3d 997, 1005 (8th

---

[3]At oral argument, the state cited two cases for the proposition that an officer can enter any part of a driveway to conduct an investigation. But both cases are factually distinguishable from the case here. In *State v. Girdler*, 138 Ariz. 482, 484-85, 675 P.2d 1301, 1303-04 (1983), the defendant set fire to his mobile home, with his wife and children inside, and was convicted of arson of an occupied structure and felony murder. An officer and prosecutor went to the residence without a warrant and measured the time it took "to go from the back door of the burned-out mobile home to the defendant's car." *Id.* at 486, 675 P.2d at 1305. The court concluded the defendant did not have a reasonable expectation of privacy in that area because, "[f]rom a photograph of the premises, it is obvious that the area was open to the public." *Id.* at 487, 675 P.2d at 1306. And in *United States v. Humphries*, 636 F.2d 1172, 1178 (9th Cir. 1980), an officer, acting with probable cause that a vehicle parked in defendant's driveway had been involved in a crime, drove onto the driveway to confirm the license plate number, which he could not see from the street. The court found no violation of the defendant's

Cir. 2010), officers went to the residence to make an arrest, and, as they were standing at the front door, they saw the suspects attempting to dispose of evidence. Therefore, the court concluded that, even assuming the officers had entered the curtilage impermissibly, "suppression is not required, because the officers at the front of the house independently observed the apparent destruction of evidence and entered the home under exigent circumstances." *Id*. And in *United States v. Pineda-Moreno*, 591 F.3d 1212, 1213 (9th Cir. 2010), the officer went onto the driveway of the residence to place a tracking device under the suspect's car. However, the court there reasoned that the officer had restricted his movement to an area visitors would have used to approach the front door of the house.[4] *Id.* at 1215 (investigating agent testified driveway necessary path to approach house). In both cases, the officers were in an area where the public reasonably would be expected to enter to contact the occupants of the residence. But Silva went beyond the area of the driveway that visitors would have used to directly approach the front door. He did so to investigate the vehicle, not to make contact with

_____

reasonable expectation of privacy, in part because the very purpose of a license plate is to allow law enforcement to identify the vehicle. *Id.* at 1179, 1179 n.12. Thus the court held the defendant had no reasonable expectation of privacy in the license plate of his vehicle. *Id.* Therefore, neither case squarely resolves the issue here.

[4]The state also cites to *State v. Dugan*, 113 Ariz. 354, 356 n.1, 555 P.2d 108, 110 n.1 (1976), and *Baker v. Clover*, 177 Ariz. 37, 39, 864 P.2d 1069, 1071 (App. 1993), in support of its argument. However, neither of these cases actually reaches the issue raised here; *Dugan* turned on the issue of consent, and *Baker* does not reach the issue before us because the arrest in that case had occurred in the garage, not on the driveway. Therefore, these cases are inapposite.

one of the occupants of the residence. Thus, neither of these cases addresses the issue presented here.[5]

¶13        And, we have found no Arizona cases addressing whether there is a greater expectation of privacy in semiprivate areas that the public is not expected to access freely so that they are afforded the same Fourth Amendment protections applicable to the curtilage generally. In reviewing the case law from other jurisdictions, we found two distinct categories of cases involving driveways in which the courts found no Fourth Amendment violation. In the first category, the officer entered the curtilage intending to approach an occupant of the property.[6] In the second category, the officer, intending to conduct an investigation rather than contact the occupants, nevertheless restricted his movements to areas of the driveway and walkway that the public would reasonably be expected to use to make contact with occupants of the residence.[7]

---

[5]The state also relies on *Pineda-Moreno* for the proposition that, in order to establish an expectation of privacy, Blakley was required to "'support that [heightened] expectation by detailing the special features of the driveway itself (*i.e.*, enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it.'" *See Pineda-Moreno*, 591 F.3d at 1215 (citation omitted). But in *Pineda-Moreno*, the defendant was claiming an expectation of privacy in an area of the driveway that ordinarily would be used by the public. *Pineda-Moreno* thus stands for the proposition that a person seeking a greater level of privacy than ordinarily would be expected must show facts supporting this heightened expectation.

[6]*See, e.g.*, *United States v. Reyes*, 283 F.3d 446, 465 (2d Cir. 2002); *United States v. Magana*, 512 F.2d 1169 (9th Cir. 1975); *State v. Cobb*, 115 Ariz. 484, 566 P.2d 285 (1977); *State v. Johnston*, 839 A.2d 830 (N.H. 2004); *State v. Johnson*, 793 A.2d 619 (N.J. 2002); *State v. Lodermeier*, 481 N.W.2d 614 (S.D. 1992); *State v. Ryea*, 571 A.2d 674 (Vt. 1990); *State v. Daugherty*, 591 P.2d 801 (Wash. App. 1979); *McCutcheon v. State*, 604 P.2d 537 (Wyo. 1979).

[7]*See, e.g.*, *Pineda-Moreno*, 591 F.3d 1212, 1215 (investigating agent testified person attempting to make delivery to house would have to go through driveway to get

9

¶14     In those cases in which the courts found the officers' actions reasonable under the Fourth Amendment, the officers had entered an area of the driveway that led directly to the front door for the purpose of contacting an occupant of the home, or had limited their investigation to those areas ordinarily accessed by visitors. Indeed, in the only two cases we have found in which the officers went beyond the area normally used to access the front door directly in order to conduct an investigation, the courts found the officers had violated the defendants' Fourth Amendment rights.[8]

¶15     We find instructive the analysis of the Ninth Circuit Court of Appeals in *United States v. Magana*, 512 F.2d 1169 (9th Cir. 1975). In *Magana*, two officers drove into Magana's driveway to provide back-up to an undercover officer who was buying drugs from an occupant of the house. 512 F.2d at 1170. Magana, who was standing in the open garage, was arrested after one of the officers saw him throw something to the ground. *Id.* The other officer then entered the garage and found two condoms

---

to house); *McVickers v. State*, 551 So. 2d 1130, 1134 (Ala. Crim. App. 1989) (no Fourth Amendment violation when officers restricted movements to places visitors could reasonably be expected to walk); *People v. Bradley*, 81 Cal. Rptr. 457, 459 (1969) (no violation where marijuana was only about twenty feet from defendant's door where delivery person would go); *Com. v. A Juvenile (No. 2)*, 580 N.E.2d 1014, 1016 (Mass. 1991) (no violation where vehicle parked on area of driveway within normal route for approaching front door of residence); *State v. Pike*, 465 A.2d 1348, 1351 (Vt. 1983) (no violation when officers restrict their movements to driveways visitors could be expected to use).

[8]*See Wattenburg v. United States*, 388 F.2d 853 (9th Cir. 1968) (Fourth Amendment violated when officers entered property to search stockpile of Christmas trees located within residence's curtilage for illegally cut trees; because officers had to move legally cut trees to see contraband, suspect's reasonable expectation of privacy violated); *People v. Quattrachi*, 63 A.D.2d 655 (N.Y. App. Div. 1978) (Fourth Amendment violation when officers, acting only on vague suspicions, entered fenced-in backyard to determine whether boxes being loaded onto truck contained contraband).

containing heroin. *Id.* The district court denied Magana's motion to suppress the heroin found in the garage, and the Ninth Circuit affirmed. *Id*. at 1169, 1171.

¶16 In determining whether Magana had a reasonable expectation of privacy that precluded the officers from entering the driveway and approaching him in the garage without a warrant, the Ninth Circuit stated the issue was whether the officers' purpose for being there was reasonable: "[t]he test . . . should be that of reasonableness, both of the possessor's expectation of privacy and of the officers' reasons for being on the driveway." *Id*. at 1171. In applying this test, the court focused on the fact that the officers were present to provide back-up to their fellow officer, who was "known to be effecting the arrest of a narcotics dealer engaged in business in the residence of which the driveway formed a part." *Id*. The court thus concluded that "[t]he act of . . . turning into the driveway at the time and under the circumstances of this case was reasonable," and "Magana's privacy was not unreasonably invaded when the officers entered his driveway and then saw him throw something away." *Id*. It thus held the officers' actions passed the two-part reasonableness test and their presence in the driveway therefore was lawful. *Id.*

¶17 Here, instead of approaching the front door to make contact with any occupants of the residence, Silva walked past the pathway that led directly to the front door and continued walking down the driveway into an area ordinarily not used by visitors. And at the suppression hearing, Silva acknowledged that his original intent when he entered the property was to "knock and talk" to an occupant of the residence, but instead, he decided to investigate the vehicle. Applying *Magana*'s reasonableness

11

test to the facts of this case, we conclude that in exceeding the boundaries of the area commonly accessed by visitors, with no intent to locate an occupant but, rather, for the purpose of conducting an investigation, Silva's actions in approaching the vehicle violated Blakley's reasonable expectation of privacy in that area of his property. Silva's presence near the vehicle on Blakley's driveway therefore was unlawful. And, in the absence of a warrant, or an exception to that requirement, the search of the garage that followed also was unlawful.

## B. Consent

¶18        "One long recognized exception to the warrant requirement is consent." *State v. Guillen*, 223 Ariz. 314, ¶ 11, 223 P.3d 658, 661 (2010). But,

> [w]hen a consensual search is preceded by a Fourth Amendment violation, . . . the government must prove not only the voluntariness of the consent under the totality of the circumstances, but . . . must also "establish a break in the causal connection between the illegality and the evidence thereby obtained."

*United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) (citation omitted), *quoting United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir. 1985); *see also Guillen*, 223 Ariz. 314, ¶¶ 11-13, 223 P.3d at 661 (addressing whether defendant's wife's consent to search voluntary before analyzing whether consent tainted by prior constitutional violation). Thus, because Silva was not lawfully present when he obtained Blakley's consent, the evidence obtained without a search warrant must be suppressed unless Blakley's consent to the search was voluntary and had not been tainted by Silva's unlawful presence.

¶19        Blakley does not contend that his consent was involuntary. Nor does the record suggest the encounter between Silva and Blakley involved the type of overt conduct traditionally viewed as coercive. Neither Silva nor the other officers displayed weapons, forcibly entered the property, or threatened or used force against Blakley; he was not handcuffed; and Silva made no threats that he would obtain a warrant if Blakley refused consent. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(b) (4th ed. 2004) (describing factors typically supporting a finding of coercion).

¶20        Nevertheless, a finding of voluntary consent is merely a threshold inquiry, and the evidence still must be suppressed unless the consent was purged of the taint of Silva's illegal entry. *See Guillen*, 223 Ariz. 314, ¶ 13, 223 P.3d at 661 ("Evidence seized following consent to a search must be suppressed if the consent is tainted by a prior constitutional violation."); *State v. Kempton*, 166 Ariz. 392, 398, 803 P.2d 113, 119 (App. 1990) ("[T]he unconstitutional acts of an officer taint a consensual search unless there are sufficient intervening circumstances between the unlawful conduct and the consent to" dissipate the taint of the illegal conduct.). In determining whether the consent is purged of the taint,

> [w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection [has been] made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

13

*Wong Sun v. United States*, 371 U.S. 471, 488 (1963), *quoting* Maguire, *Evidence of Guilt* 221 (1959). And, in determining whether consent is "purged of the primary taint" created by an officer's illegal conduct, we consider the temporal proximity of the consent to the illegal search, the presence of intervening circumstances, and the purpose and flagrancy of the officer's misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

**¶21**　　　　Applying the *Brown* factors in this case, we first address the temporal proximity of the unconstitutional conduct and the consent. Blakley consented to the search simultaneously with Silva's illegal presence. This factor thus favors Blakley. *See, e.g.*, *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988) (citing cases holding consent insufficient to dissipate taint when given between minutes and hours after illegal conduct). And, because the police misconduct and consent were simultaneous, there were no intervening circumstances. *See State v. Monge*, 173 Ariz. 279, 281, 842 P.2d 1292, 1294 (1992) ("Consent is of little significance when there are no intervening circumstances between the illegal arrest and the consent."). *See also United States v. Furrow*, 229 F.3d 805, 814 (9th Cir. 2000) ("Lack of knowledge of a prior search is an intervening factor which dissipates the coercion inherent in a request for consent made after . . . unconstitutional [act]."), *overruled in part on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001); *Guillen*, 223 Ariz. 314, ¶ 17, 223 P.3d at 662 (noting resident's lack of knowledge of constitutional violation "constitutes a major break in the causal chain").

¶22     Considering *Brown*'s third factor, the purpose and flagrancy of the official misconduct, there was no evidence that Silva's intrusion into a constitutionally protected area of the property was for a legitimate purpose. Silva testified at the suppression hearing that his specific intent in entering that area was to investigate the vehicle and not to make contact with any person. Indeed, he testified that he had not "see[n] anybody at all" on the property before walking into that area.

¶23     And, far from showing that the drug evidence was acquired by means distinguishable from the illegal entry and search, the record before us demonstrates that Blakley's admission and consent were secured by the illegal act itself. Silva testified that he could smell the odor of raw marijuana when he was standing by the vehicle during his conversation with Blakley. Nothing in the record suggests Silva could smell the marijuana prior to walking into the area where the vehicle was parked. The record thus suggests that information acquired after the illegal intrusion, at minimum, had some influence on the nature of the exchange between Silva and Blakley.

¶24     Although Blakley apparently concedes his consent was voluntary, we are mindful that he was not obligated to talk to Silva at all. Arguably, by intruding in an area not ordinarily accessed by visitors, an area in close proximity to the place where the marijuana was stored, Silva caused an encounter that would not necessarily have occurred had Silva attempted to make contact with Blakley by knocking on his front door. *See United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008) (defendant not required to answer door in absence of warrant). To this extent, Silva exploited his illegal intrusion through the encounter that led to Blakley's confession and consent to search.

15

**¶25**         We also observe that Silva did not give *Miranda*[9] warnings to Blakley either before or after Blakley had confessed to storing marijuana in his garage. In *Guillen*, our supreme court noted:

> In analyzing whether a confession was obtained by exploitation of an illegal arrest, the Court in *Brown* also considered whether the police gave *Miranda* warnings to be "an important factor." "Although *Brown* dealt with the exclusion of a defendant's statements, [the reasoning in *Brown*] applies equally to contraband revealed by [a] consent search."

223 Ariz. 314, n.2, 223 P.3d at 663 n.2 (citation omitted), *quoting Kempton*, 166 Ariz. at 398, 803 P.2d at 119 (alterations in *Guillen*). At the suppression hearing, Silva testified that after Blakley's confession, he was not free to leave; indeed, no reasonable person would have believed otherwise. *See Florida v. Royer*, 460 U.S. 491, 501 (1983) (defendant "effectively seized for purposes of the Fourth Amendment" when "'reasonable person would have believed that he was not free to leave'"), *quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Thus, *Miranda* warnings were required before additional questioning. *See State v. Kennedy*, 116 Ariz. 566, 568-69, 570 P.2d 508, 510-11 (App. 1977). And given Blakley's immediate confession, he reasonably might have believed it was fruitless to refuse consent to search the garage. *See Furrow*, 229 F.3d at 814 (when officer seeks consent to second search of residence after prior illegal search, defendant "might reasonably think that refusing to consent . . . when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out").

---

[9]*Miranda v. Arizona*, 384 U.S. 436 (1966).

¶26        We therefore conclude that Silva exploited his unlawful presence by obtaining Blakley's consent.  For this reason, the trial court erred in failing to suppress the marijuana.  And, as the marijuana constituted the key evidence to support his conviction, Blakley's conviction must be vacated.  *See State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993) (where error contributed to verdict, it cannot be deemed harmless).

## Disposition

¶27        For the reasons above, we vacate Blakley's conviction and sentence and remand this matter for further proceedings consistent with this opinion.[10]

/s/ *Garye L. Vásquez*
GARYE L. VÁSQUEZ, Presiding Judge

CONCURRING:

/s/ *Peter J. Eckerstrom*
PETER J. ECKERSTROM, Judge

/s/ *Virginia C. Kelly*
VIRGINIA C. KELLY, Judge

---

[10]In light of our resolution of this issue, we need not consider the remaining issues Blakley raises.

17